## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DINA DUKHQAN,<br>5125 25th Place N.<br>Arlington, VA 22207, | )<br>)<br>)    Civil Action No. _____ |
|     Plaintiff, | )    Jury Demand<br>)<br>) |
|       v. | )<br>) |
| AMERICAN NEAR EAST<br>REFUGEE AID (ANERA),<br>1111 14th Street, N.W.<br>Washington, D.C. 20005, | )<br>)<br>)<br>)<br>) |
|     Defendant. | )<br>) |

### COMPLAINT

Dina Dukhqan ("Ms. Dukhqan" or "Plaintiff") brings this action against her former

employer, American Near East Refugee Aid ("ANERA" or "Defendant"), for discrimination,

retaliation and a hostile work environment based on Race (Arab American), National Origin

(Jordanian), and Religion (Muslim) in violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. §§ 2000e-1, *et seq.,* the District of Columbia Human Rights Act, D.C. Code Ann. §§

2.1401.01 *et seq.*, and the whistleblower protections in the Taxpayer First Act, 26 U.S.C. §

7623(d) ("TFA").

### INTRODUCTION

Plaintiff started working for ANERA on October 1, 2018 believing that the job would fit

her skills, experience and desire to assist refugees in the Middle East, her home region. Although

she met all reasonable expectations that ANERA could have had, by leading her team to develop

significant new funding, the organization did not live up to the expectations that she had for

nondiscrimination, transparency, and lawful conduct. She and other Arab female employees were

1

treated differently and demeaned. She also found that the organization did business with an overseas nonprofit that channeled donor funds to the benefit of its owner. Eventually, in November of 2020, Plaintiff made a formal internal whistleblower complaint, including issues of racial, national origin, and religious discrimination with her concerns about unlawful financial practices. She fully cooperated with the investigation of her complaint but at the end of the investigation, the main step ANERA took was to fire her, which happened on April 13, 2021.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves a federal question regarding Defendant's discrimination and retaliation against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e-2 and 2000e-2, and Title 42 Section 1981, and unlawful retaliation against Plaintiff in violation of Section 7623 of the Taxpayer First Act of 2019, 26 U.S.C. § 7623(d).  The Court has supplemental jurisdiction over Plaintiff's related claims arising under District Columbia law pursuant to 28 U.S.C. § 1367(a).

2.      This Court has personal jurisdiction over Defendant, pursuant to D.C. Code Ann. § 13-423(a)(3)(2001 ed.).

3.      Pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3), venue is proper in this judicial district as the statutory violations, acts of discrimination and retaliation occurred in the District of Columbia, where Defendant's headquarters are located and where many of the pertinent records are located.

## PARTIES

4.      Plaintiff, Dina Dukhqan, resides at 5125 25th Place N., Arlington, VA 22207. From October 1, 2018 until she was fired on April 13, 2021, Ms. Dukhqan worked for the Defendant American Near East Refugee Aid ("ANERA") as a Senior Director and member of the Senior Leadership Team.

5.      Defendant, ANERA, is a not-for-profit organization incorporated in Washington, D.C. Its headquarters is at 1111 14th Street, N.W., Washington, D.C. 20005. The Internal Revenue Service granted ANERA 501(c)(3) tax-exempt status. ANERA receives tax deductible contributions from individuals in the U.S. and grants from the U.S. government, private foundations, and agencies associated with the United Nations.

## STATEMENT OF FACTS

**A.  Background of the Plaintiff**

6.      Ms. Dukhqan was born and raised in the country of Jordan. She became a naturalized United States citizen in 2014. Her religion is Muslim, and her race is Arab American.

7.      Ms. Dukhqan has a master's degree and more than 20 years of experience in the not-for-profit sector with a focus on international development in the Middle East. She is fluent in English and Arabic. She has an established network of contacts among organizations, leaders, and funders in the United States. She has held multiple senior and executive level positions during her career.

**B.  Plaintiff's Responsibilities Were Equivalent to The Duties of an ANERA Vice President but her Pay and her Title were not.**

8.      On October 1, 2018, Plaintiff was hired by ANERA as the Senior Director for New Business Development ("NBD"). The hiring official was ANERA's President and Chief Executive Officer ("CEO"), Sean Carroll.

9.     ANERA has repeatedly represented to the United States Internal Revenue Service (the "IRS"), under oath, that it determines compensation for its top management officials and other officers or key employees of the organization using "review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision."  In 2017, ANERA adopted a policy of paying its senior officers based on independent market studies by outside consultants. ANERA had a market study done based on Plaintiff's job description when she was hired, but never updated her job description or reran their study when her duties were significantly increased. As a result, Plaintiff was paid less than White, U.S.-born, Christian members of the senior leadership team for equivalent work.

10.     ANERA's human resources consultant asked the Chief Financial Officer, Donna Diane (the "CFO") why Plaintiff's starting salary was lower than the salary of comparable employees. Ms. Diane responded that she felt it was an appropriate salary for Plaintiff's skillset and cited Plaintiff's English grammar. Plaintiff, however, had to use Arabic, for substantial amounts of her work, particularly in Jordan.

11.     ANERA carries out two types of activities – revenue-generating (also known as business development and fundraising) and operations (also known as refugee and host community assistance programming).

12.     Although Plaintiff has the qualifications and experience for both business development and operations, she interviewed and was hired for business development.

13.     Plaintiff was hired to replace Ellen Giordano, a White, U.S.-born, Christian employee, who had served as the Vice President for New Business Development and also had responsibility for the Medical Donations ("MD") program (then known as the "In-Kind" program).

14.     When Ms. Giordano served as Vice President, ANERA had no NBD Senior Director. When Plaintiff served as the NBD Senior Director, ANERA had no NBD Vice President. Both Ms. Giordano and Plaintiff were members of the senior leadership team, reporting directly to the CEO, during their respective tenures at ANERA.

15.     In February 2019, ANERA added the MD program to Plaintiff's management portfolio. At that point, Plaintiff's total responsibilities were equivalent to those Ms. Giordano held, but her title and pay were still inferior.

16.     ANERA operations in Lebanon, the West Bank and Gaza are led by Country Directors, a title equivalent to Vice President.

17.     For several years, ending in 2012, ANERA had a Jordan Country Director position. In 2012, ANERA paused its operations in Jordan and eliminated the Jordan Country Director position. ANERA did not have a Country Director for Jordan when Plaintiff was hired in 2018.

18.     In 2019, ANERA resumed its operations in Jordan but did not hire a new Jordan Country Director. Instead, January 2019, the ANERA CEO gave Plaintiff the additional responsibility to manage the Jordan country program operations startup. This addition meant that Plaintiff's responsibilities far greater than her predecessor's, but her pay and title remained inferior throughout the rest of her time with ANERA.

## C. Lower Pay and Lesser Title were Just a Part of Ongoing Discrimination Against and Harassment of Plaintiff and other Arab American ANERA Employees

19.     ANERA is a 50-plus-year-old organization that has never had an Arab or Arab American Chief Executive Officer, Chief Financial Officer, or Vice President assigned to its Washington, D.C. location.

20.     In 2017, the year the current CEO was hired, the Board Governance Committee, addressing the CEO selection process, stated, in writing, that "*the assumption has been that we wanted to remain a visibly American organization. Until recently, only Americans were considered as a practice, not a rule.*" The Governance Committee also noted a recommendation to recruit for the Board more "*Anglos*," more women, and more "Internationals."

21.     Consistent with its past practice, in September 2017, ANERA hired the current CEO, a White male of U.S. origin. He was hired over a qualified Arab American female candidate. One Board member who served on the hiring committee resigned in protest.

22.     In 2018, the CEO submitted a Palestine Country Director candidate to the ANERA Board for approval. The final candidates were an Arab American woman and a White, U.S.-born, Christian male. On multiple occasions, the CEO stated that the Arab American female candidate was more qualified. The Board repeatedly delayed its decision until she withdrew her application and the male applicant was chosen.

23.     In October 2018, when ANERA hired Plaintiff as a Senior Director, her assigned title was less significant than her assigned duties, but she still became the highest-ranking Arab American in the D.C. office in ANERA's 50-plus-year history.

24.     Throughout her time at ANERA, Plaintiff endured mistreatment from Donna Diane, ANERA's Chief Financial Officer (the "CFO"). Ms. Diane excessively scrutinized Plaintiff's English grammar in private internal communications, minimizing the numerous other skills that Plaintiff contributed to the organization, including her fluency in Arabic, her first language, and her cultural competency from being raised in Jordan.

25.     On several occasions the CFO mocked Plaintiff in front of her coworkers and staff by behaving as if she didn't understand what Plaintiff was saying.

6

26.    The CFO used Plaintiff's English grammar as a reason to pay Plaintiff a lower starting salary than her predecessor.

27.    At ANERA, bias against Arab American employees manifested not only in hiring and promotion decisions but in frequent day-to-day comments and behaviors. In 2019, the CEO shared with a staff member his belief that traditional head scarves are an obstacle to communicating with Muslim women. The CEO openly complained that Muslim staff become less productive during the fasting month of Ramadan but lack of productivity during Christmas holidays was not an issue – employees were encouraged to take more leave at that time. The CEO said of one Arab-American employee on Plaintiff's team that, "*She behaves like a rich girl*" and "*I don't know something is still off about her, that I can't quite figure it out.*" In front of senior staff, early Spring of 2021, the CEO labeled an Arab employee as "*non-resilient*" when she resigned a position in Lebanon to get away from instability and conflict in that country.

28.    While in Jordan during the summer of 2019, Plaintiff was assigned to work with the owner of ReBoot Kamp ("RBK"). RBK was incorporated under Jordanian law as a not-for-profit. At that time, RBK ran coding academies in Jordan, the West Bank and Gaza under a grant agreement with ANERA. RBK's owner showed profane and profound cultural insensitivity towards Arabs and created a hostile work environment for female ANERA employees. Plaintiff and others informed the ANERA CEO who told Plaintiff that she should "coach" RBK's owner to be more culturally sensitive.

29.    In September 2019, RBK's owner met with other ANERA staff in D.C., several of whom complained about his racist comments toward Arabs, such as, "*There's a different standard of integrity in the Middle East*," and "*a generation or two ago, they would have chopped off my head*." ANERA's CEO said the abhorrent comments had to be tolerated because

7

the program would create employment opportunities for youth in the region. The CEO blamed

his staff for sensitivity, saying, "*people who speak English as a second language take things*

*literally and misunderstand comments to be racist when they are not*."

30.     The week before the COVID-19 shutdown began in 2020, in a meeting involving

the CEO and several ANERA employees, Plaintiff objected to travel overseas at that time. The

CEO stated, "*We need to talk to your husband to be more supportive*," perpetuating the

stereotype that Arab women are subordinate to their husbands.

31.     On October 3, 2019, Plaintiff submitted a complaint to the CEO and Defendant's

HR consultant, which stated that the Ms. Diane had been bullying and harassing her. Plaintiff

never received a response.

32.     The CFO showed disregard for discrimination complaints in general, telling

Plaintiff, that she has been sued in the past for discrimination, as if she was proud of being sued.

In fact, on March 2, 2012, Ms. Connie Shao filed a complaint in the United States District Court

for the Southern District of New York in which she alleged that Ms. Diane regularly humiliated

her because of her accent and country of origin. Ms. Chao submitted a declaration averring that

on February 23, 2011, Ms. Diane said to her "I hated you from the first day because of your

accent." Seven-and-a-half years later, Ms. Diane met Ms. Dukhqan at ANERA and treated her

like she allegedly treated Ms. Shao. For example, Ms. Diane told ANERA's human resources

consultant in the fall of 2018 that Plaintiff should receive pay lower than her peers because of her

lack of command of her second language, English.

33.     On May 20, 2020, Plaintiff complained in writing to the CEO, the new HR

consultant, and ANERA's outside attorney concerning workplace bullying and harassment from

the CFO. Plaintiff reported an incident where the CFO openly accused Plaintiff of misclassifying

an employee and risking exposing ANERA to liability for tax non-compliance. However, ANERA's attorney concluded that Plaintiff actions did not create such a risk. The CEO told Plaintiff that he knew that the CFO's behavior was "problematic" and that he would work on it. Despite his comments, there was no plan or concrete action to address this mistreatment.

34.     In June 2020, the CEO admitted to Plaintiff in the presence of the CFO, and ANERA's Human Resources consultant that he was biased against Plaintiff and treated her differently than the White, U.S.-born staff.

35.     On June 10, 2020, an Arab American employee who was not a direct report of Plaintiff emailed the ANERA CEO, expressing her dismay that the CEO had not addressed racist and sexist comments by the RBK owner. The employee wrote that she was frustrated by the paltry number of Arab Americans in senior leadership positions and that she felt stifled and "defeated" in her growth at the organization. Plaintiff was the only Arab American in ANERA's senior leadership. Other Arab Americans at ANERA headquarters shared with her how they were also mistreated, which heightened Plaintiff's stress level, making her feel powerless to help others who needed her.

36.     The next day, June 11, 2020, in a senior management meeting, the CEO told his senior leadership staff that ANERA's board reserved certain senior positions at ANERA, including his position, for White, U.S.-born personnel. When Plaintiff audibly objected to the unfairness, the CEO replied, in front of the rest of senior management, that "*it was the Arab American board members who wanted it this way and not the White Americans*."

37.     During the month of July 2020, an outside consultant surveyed ANERA's employees. Employees reported that racially- and culturally-insensitive comments were a norm at ANERA and that the organization did not take seriously complaints about race and gender by

9

members of minority groups. The survey summary concluded that "ANERA employees do not believe that all (specifically Arab) voices and opinions are heard and/or equally valued by the SMT. Further, there is a belief that micro-aggressions go largely unchallenged in the organization.

38.     At internal Diversity, Equity and Inclusion training workshops held during the summer of 2020, Plaintiff voiced her concerns multiple times about ANERA's failure to address the RBK owner's discriminatory comments against Arab-American staff. ANERA continued to ignore Plaintiff's pleas to address the discrimination.

**D. Despite the Hostile Work Environment, Plaintiff's Performance at ANERA Was Exemplary but ANERA did not Promote Her as Promised**

39. As the Senior Director for New Business Development, Plaintiff was responsible for revenue growth. She had a stellar performance record, including substantially exceeding the NBD budget target for FY 2020, her first full fiscal year with ANERA (July 1, 2019 to June 30, 2020). During the next fiscal year, FY 2021, NBD revenue was 73% higher than the budgeted target. Early revenue figures for FY 2022 showed her continued progress. The NBD group had a 60% win rate, double the industry standard. While Plaintiff was responsible for MD, program revenue increased from $34 million to $88 million, for FY2020. MD revenue continued to increase in FY 2021. In April 2021, when ANERA terminated Plaintiff, the MD program was projected to bring in $100 million.

40. In March 2020, ANERA's CEO verbally told Plaintiff that he would promote her if she continued to meet her financial targets. Plaintiff exceeded her targets but she never received a promotion.

41. On June 23, 2020, Plaintiff received a performance review from the CEO, who told her in writing that she had a "great year" but stated that her promotion would be delayed for financial

reasons. A few months later, however, in September 2020, the CEO announced plans to give other members of the ANERA senior management team raises, undermining his prior claim that ANERA could not afford a raise for Plaintiff.

42. Plaintiff emailed the CEO and ANERA's HR consultant multiple times during the summer of 2020 and early 2021 requesting that her title and job description be adjusted to no avail.

43. On October 22, 2020, Plaintiff wrote to the CEO, CFO, and HR to officially request that she be fairly compensated in comparison to her White, U.S.-born senior leader peers.

44. On November 3, 2020, the CEO offered Plaintiff: (1) a conditional 5% raise, retroactive to June 1, 2020, to "recognize success in your role as Senior Director"; and (2) to discuss and agree on a new job description for a VP position with a goal for the role and promotion to become effective at the start of the new fiscal year (June 1, 2021)."

45. In early 2021, Plaintiff again emailed ANERA's HR consultant multiple times requesting that her title and job description be adjusted to reflect the significant increase in her portfolio. ANERA continued to ignore her emails.

**E. Plaintiff Identified Misuse of Donated Funds by ANERA's Vendor and Putative Partner in Jordan.**

46.      Before working for ANERA, Plaintiff had substantial experience working for nonprofits in Jordan and the United States. She knew that a non-profit corporation operating under U.S. law has to take steps to insure that corporations it did business with overseas complied with law in their home countries.

47.      On paper, ANERA appeared to be aware of this requirement as well. Its bylaws stated that ANERA personnel could not use corporate assets and funds in any way that would be improper for tax exempt organizations and ANERA's internal Foreign Corrupt Practices Act

procedures required that ANERA personnel to give notice to ANERA's CEO and legal counsel of any "questionable practice" by a contractor or joint venture partner.

48.     While Plaintiff was assigned to work in Jordan during the summer of 2019, she learned that RBK's owner was personally benefiting. Later, Plaintiff saw substantial consulting fees and potential bonuses for RBK's owner in budgets prepared by the ANERA CFO.

49.     From August 2019 to April 2021, Plaintiff complained about illegal conduct and racism by RBK. She urged ANERA to terminate its relationship with RBK. She said, both explicitly and implicitly, that the relationship with RBK was a compliance problem for ANERA.

50.     These requests had little or no lasting effect. In the spring 2020, six months after Plaintiff and others first raised issues, the CEO verbally proposed that RBK's owner and ANERA co-own a for-profit subsidiary. Plaintiff vigorously opposed this proposal. She told the CEO that this arrangement would violate U.S. tax law by allowing RBK's owner to benefit personally from programs that ANERA initiated with donated funds.

51.     On August 6, 2020, the ANERA Board member who led the Governance Committee raised concerns about RBK and requested that the ANERA-RBK partnership be vetted. The board member also scolded the CEO about his lack of authority to use ANERA's unrestricted funds for the RBK project without Board approval. The CEO responded that he was not using ANERA's unrestricted funds and was instead using restricted funds he had raised from donors. Plaintiff knew this was not a true statement and informed two Board members immediately afterwards.

52.     On August 18, 2020, Plaintiff informed two Board members of ANERA's 2019 investigation of RBK and told them to insist on reviewing detailed financial statements for the RBK project.

53.     On August 25, 2020, the CEO through his assistant, asked Plaintiff to confirm, in writing, that RBK was in good standing at that time. Plaintiff replied that ANERA was not in good standing and she noted that the public record showed RBK's owner had <u>not</u> transferred his own shares of RBK, which he would have to have done to comply with Jordanian law.

54.     On September 9, 2020, an ANERA Board member, performing due diligence, wrote to the CEO, CFO, and outside counsel and asked questions about RBK and its owner. Two days later, September 11, 2020, the CEO referred the questions to Plaintiff and told her to direct staff in Jordan to conduct due diligence, which would distance the Board from the review. Plaintiff told the CEO, the CFO, and ANERA's outside counsel that RBK's active corporate registration did not mean RBK was in good standing.

55.     On September 12, 2020, the CEO told Plaintiff not to conduct due diligence on RBK.

56.     On September 21, 2020, the CEO announced ANERA was freezing or pausing its relationship with RBK.

57.     Just five weeks later, starting on October 31, 2020, Plaintiff received text messages and voice mail showing that, contrary to instructions from the Board, the CEO was not only preparing to resume the relationship with RBK in Jordan but to expand it to Lebanon.

**F.  Plaintiff Filed an Internal Whistleblower Complaint Alleging Both Discrimination and Financial Misconduct.**

58.     Prompted by learning that the CEO intended to continue to work with RBK, without addressing the issues she had raised, Plaintiff submitted a whistleblower complaint to ANERA on November 9, 2020, through her attorney, in which she reported discrimination against ANERA's Arab American employees and also the CEO's plans to reengage with RBK. Plaintiff stated that RBK's partnership posed organizational risks to ANERA, including the fact

that RBK's owner was violating Jordanian law by miscoding wire transfers so that he would not need to get certain approvals from the Jordanian government. She also raised concerns that RBK's owner was also the CEO, had no board supervision, was benefiting financially from the corporation, and that the ANERA CEO had falsely claimed this individual had divested himself of his interest in RBK.

59.     ANERA assigned an attorney from its outside counsel's law firm to investigate. Plaintiff fully cooperated and was interviewed twice. In an interview on December 10, 2020, Plaintiff shared that board approval was required for RBK's partnership. Plaintiff also explained that the CEO did not seek competing bids to ensure that ANERA was paying a fair market price for RBK's services. Plaintiff also expressed concern that she would be retaliated against for raising these issues.

60.     On January 5, 2021, Plaintiff had a second and final interview for the investigation. ANERA's board was apprised on January 17, 2021 that the investigation would be done in two or three weeks.  That was not the case – when Plaintiff was terminated, as far as she knew the investigation still was not closed.

61.     On March 10. 2021, Plaintiff filed an EEOC complaint of employment discrimination alleging unlawful discrimination based on her race, national origin, religion and retaliation.

### G.  Shortly after the Investigation of Plaintiff's Internal Whistleblower Complaint, ANERA Took Steps to Fire Her.

62.     On March 25, 2021, three months before the end of FY2021, the CFO presented a recalculated budget for the medical donations program to a meeting that included Ms. Dukhqan, her staff, and ANERA's accountant. Ms. Dukhqan's team was responsible for in-kind donations of medicine and medical supplies and for raising funds for shipping costs. The separate

14

Fundraising team was responsible for raising unrestricted funds that could be used for staff salaries. In the CFO's recalculation, she added hundreds of thousands of dollars in salary costs to the program budget, an increase of almost 50%. The CFO alleged that the program had a $500,000 deficit. In front of other staff, the CFO scolded Plaintiff for this apparent loss. Plaintiff pointed out that she had no control of the cost side and was not even responsible for raising funds for salaries. The CFO told Plaintiff to raise an additional $3 million in time to spend it before the end of the fiscal year. The CFO conceded this seemed impossible and told Plaintiff to take that up with the CEO. Afterwards, the team member responsible for the program texted Ms. Dukhqan to emphasize how tiring it was to watch this conflict. Separately, the CEO told this team member that her reporting relationship to Ms. Dukhqan was about to end.

63.    In late March 2021, ANERA announced a newly-created position for a Chief Revenue Officer ("CRO") that would supervise Plaintiff's position. Bringing in the CRO would mean a demotion for Plaintiff. She applied to be the CRO but did not receive an interview.

64.    On April 5, 2021, Plaintiff, through counsel, informed the outside investigator about the manipulation of the organization's budgets and the newly created CRO position. The investigator asked no new questions.

65.    On April 13, 2021, ANERA terminated Plaintiff. To Plaintiff's knowledge, ANERA never took any action on her whistleblower complaint, other than conducting an investigation and then firing her for starting it.

66.    At the time of her termination, ANERA told Plaintiff the reasons for her termination were (i) that her performance was deficient and (ii) that she had failed in leading her team.

67.     While still employed by ANERA, Plaintiff was never told that her financial performance was so deficient it could lead to termination. Apart from the CFO's manipulation of cost data, Plaintiff's financial results for this fiscal year were far above her targets. Her November 2020 review, her last one, stated that she could be promoted, although she would have to wait. ANERA gave Plaintiff no notice of deterioration of her performance. To justify terminating Plaintiff, ANERA gave the implausible justification that, during this notice-free period of less than six months, Plaintiff's performance deteriorated from "promotable" to "fire-able" in less than six months.

68.     In several other situations, when ANERA received complaints about a supervisor or a leader, ANERA informed the individual and gave them opportunities to respond and to improve. Plaintiff was not told of any employee complaints about her until she was fired, suggesting team unhappiness was another of ANERA's explanations for Plaintiff's termination has changed over time.

69.     On May 26, 2021, ANERA told the District of Columbia Office of Employment Services that Plaintiff had resigned, which was another untruthful explanation.

## ADMINISTRATIVE EXHAUSTION

70.     On March 10, 2021, Plaintiff filed a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC") (No. 570-2021-00040) alleging a hostile work environment and denial of promotion in violation of Title VII and the DCHRA based on race, national origin, religion and retaliation for opposing discrimination in the workplace.

71.     On April 27, 2021, Plaintiff filed a second charge with the EEOC (No. 570-2021-01255) alleging that ANERA fired her to retaliate against her for filing her first EEOC charge.

72.     On July 12, 2021, Plaintiff filed a TFA whistleblower complaint with the Occupational Safety and Health Administration ("OSHA") of the U.S. Department of Labor

against Defendant ANERA for retaliation against Plaintiff for making internal complaints about Defendant's alleged violations of the United States Internal Revenue Code of 1968.

73.      More than 180 days have passed since Plaintiff filed her TFA claim with OSHA, the Secretary of Labor has not issued a final decision, and so Plaintiff is entitled to seek a jury trial in this Court on her TFA claim. 26 U.S.C. § 7623(d)(2)(v).

74.      On April 13, 2022, EEOC issued the attached Notices of Right to Sue on both of Plaintiff's charges, entitling Plaintiff to seek a jury trial in this Court on her Title VII and DCHRA claims. Attachment A.

**COUNT I**
**Pay Discrimination Because of Race**
**<u>42 U.S.C. Section 1981</u>**

75.      This Count includes each and all of the preceding factual allegations.

76.      Under 42 U.S.C. Section 1981, all persons within the jurisdiction of the United States have the same right to make and enforce contracts that White citizens enjoy.

77.      Although Plaintiff was an "at will" employee of ANERA, her employment relationship with ANERA was a contractual relationship.

78.      Plaintiff's race is Arab American, she is citizen of the United States, and under its jurisdiction. White United States citizen who had the title of Vice President but did the same work.

79.      ANERA significantly increased Plaintiff's duties twice, first with the medical donations program and then with responsibilities in Jordan, but ANERA did not increase her salary to the level of another Vice President, who was white, and had the same level of responsibility as Ms. Dukhqan.

80.     As a result of ANERA's discriminatory conduct, Plaintiff experienced economic loss throughout her employment with ANERA because ANERA consistently paid her less than it paid White employees for similar work.

81.     Defendant has violated Section 1981 entitling Plaintiff to remedies as set out in the Prayer for Relief.

**COUNT II**
**Hostile Work Environment in Violation of Title VII and the DCHRA**
**Discrimination – Race, National Origin, and Religion**

82.     This Count includes each and all of the preceding factual allegations.

83.     Defendant ANERA is an employer covered by Title VII and the DCHRA.

84.     Under Title VII and the DCHRA, it is illegal for an employer to discriminate against an employee because of her race, national origin, or religion.

85.     Plaintiff's race is Arab, her national origin is Jordanian, and her religion is Muslim.

86.     Plaintiff was repeatedly subjected to comments that were insensitive to her race, national origin, and religion from ANERA's CEO and CFO, and RBK, its partner. The CEO did not address problems caused by others, made comments of his own, and repeatedly pushed off Plaintiff's promotion to a title and pay that matched her duties. The CFO subjected Plaintiff to workplace bullying and harassment by scrutinizing Plaintiff's English grammar and pretending that she could not understand Plaintiff. Defendant created a toxic workplace and did not take actions to address the discriminatory conduct.

87.     As a result of Defendant's harassment and discriminatory conduct, Plaintiff has suffered, and continues to suffer, mental and emotional hardship, economic/financial loss,

reduced possibilities for equivalent future compensation, and other additional damages, including attorneys' fees, costs, and disbursements.

88.     Defendant has violated Title VII and the DCHRA entitling Plaintiff to remedies as set out in the Prayer for Relief.

## COUNT III
### Denial of Promotion in Violation of Title VII and the DCHRA
### <u>Discrimination – Race, National Origin, and Religion</u>

89.     This Count includes each and all of the preceding factual allegations.

90.     Plaintiff joined ANERA as the only member of the Senior Leadership Team without a title of Vice President or higher. She was repeatedly promised that she would be promoted to the position of Vice President but then ANERA repeatedly pushed back the timing of this promotion. She never received the promotion.

91.     Under Title VII and the DCHRA, it is illegal for an employer to refuse to promote an employee because of her race, religion or national origin.

92.     Plaintiff's race is Arab, her national origin is Jordanian, and her religion is Muslim.

93.     ANERA did not promote Plaintiff to Vice President although it gave that title and Vice-Presidential pay to her predecessor, who had fewer duties, and her current peer, who had similar but no greater duties.

94.     As a result of Defendant's discriminatory conduct, Plaintiff has suffered, and continues to suffer, mental and emotional hardship, economic/financial loss, reduced possibilities for equivalent future compensation, and other additional damages, including attorneys' fees, costs, and disbursements.

95.     Defendant has violated Title VII and the DCHRA entitling Plaintiff to remedies as set out in the Prayer for Relief.

**COUNT IV**
**Retaliatory Termination in Violation of Title VII and the DCHRA**

96.     This Count includes each and all of the preceding factual allegations.

97.     As set forth above, Plaintiff made numerous complaints regarding Defendant's failure to give her equal pay for equal work, and permitted its contractor and senior leadership to disparage employees through insensitive comments and create an environment that favored White, U.S.-born and Christian employees.

98.     Under Title VII and the DCHRA, it is illegal for an employer to take adverse actions against an employee because she has opposed any practice of unlawful employment discrimination.

99.     Plaintiff worked for Defendant from October 1, 2018 until she was terminated on April 13, 2021.

100.    Plaintiff first engaged in protected activity beginning in 2019 when she sought pay equity and a promotion for taking on increased responsibilities.

101.    Plaintiff engaged in protected activity on November 9, 2020, by filing a formal internal whistleblower complaint including allegations of race, national origin, and religious discrimination. In addition, she participated in the investigation of that complaint on December 20, 2020, January 19, 2021, and April 5, 2021. On March 10th, 2021 and April 27, 2021, Plaintiff filed complaints with the Equal Employment Opportunity Commission.

102.    Plaintiff's allegations in her internal complaint, in the internal complaint investigation, and in her first EEOC charge included discrimination such as pay inequality,

harassment of herself and ANERA's failure to address harassment of her and other Arab
ANERA employees by the contractor and putative partner, RBK.

103.    Following her whistleblower disclosures, participation in the investigation, and
EEOC charge, Plaintiff was mistreated by ANERA and eventually terminated without cause. The
timing of her termination and the shifting reasons both show that Plaintiff's protected activity
caused her termination.

104.    As a result of Defendant's discriminatory conduct, Plaintiff has suffered, and
continues to suffer, mental and emotional hardship, economic/financial loss, reduced possibilities
for equivalent future compensation, and other additional damages, including attorneys' fees,
costs, and disbursements.

105.    Defendant has violated Title VII and the DCHRA entitling Plaintiff to remedies as
set out in the Prayer for Relief.

**COUNT V**
**Retaliatory Termination in Violation of the Taxpayer First Act**

106.    This Count includes each and all of the preceding factual allegations.

107.    As set forth above, Plaintiff made numerous complaints of discrimination and
Defendant's fraudulent activities in violation of the Taxpayer First Act.

108.    Defendant violated the Taxpayer First Act through its illegal activities and
relationship with RBK, entitling Plaintiff to an award of all applicable damages recoverable
under the law in an amount to be established at trial, plus interest, attorneys' fees, costs, and
disbursements.

109.    The timing of events shows that Plaintiff was fired for pointing out that ANERA
had improperly transferred donations to RBK and allowed the owner of RBK to personally
benefit from donated funds, for her refusal to break the law by falsely stating to ANERA's Board

of Directors that RBK was in good standing in Jordan, and for her internal whistleblower complaint and participation in the investigation of it.

110.    Defendant's wrongful action have caused and will cause Plaintiff pecuniary losses in the form of lost salary, benefits and future earnings, and non-pecuniary losses, including humiliation, shame and emotional distress, reduced possibilities for equivalent future compensation, and other additional damages, including attorneys' fees, costs, and disbursements.

111.    Defendant's unlawful discriminatory actions constitute willful, malicious, and wanton violations of the Taxpayer First Act, for which Plaintiff is entitled to an award of punitive damages.

112.    Defendant has violated the Taxpayer First Act entitling Plaintiff to remedies as set out in the Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant for the following relief:

A.  A declaratory judgment that the actions, conduct, and practices of Defendant complained of herein violate Title VII, the District of Columbia Human Rights Act, and the Taxpayer First Act;

B.  Full back pay (100%) up to the time of judgment under Section 1981, Title VII, and/or the DCHRA;

C.  Double back pay (200%) up to the time of judgment under the TFA;

D.  Full lost benefits (100%) up to the time of judgment under Title VII, the DCHRA, and/or the TFA;

E.  Reinstatement to her position at ANERA, with the same seniority status, under Title VII, the DCHRA, and/or the TFA or, in the alternative, front pay in an amount to be determined by the Court;

F.  Compensatory damages in an amount that the jury sees fit to award, under Section 1981, Title VII, the DCHRA, and/or the TFA;

G.  Punitive damages in an amount that the jury sees fit to award, under Section 1981, Title VII, the DCHRA, and/or the TFA;

H.  Pre-judgment interest on all amounts due;

I.  Post-judgment interest as may be allowed by law;

J.  Costs of litigation, including reasonable attorneys' fees and expert witness fees;

K.  All other special damages authorized by 26 U.S.C. § 7623(d)(3)(B)(iii).

L.  All other relief as this Court deems just and proper.

## <u>JURY TRIAL DEMAND</u>

Plaintiff demands trial by jury on all issues of fact and damages stated herein.

Respectfully submitted,

_____
David Wachtel, D.C. Bar # 427890
Trister, Ross, Schadler & Gold, PLLC
1666 Connecticut Avenue, N.W., 5th Floor
Washington, DC 20009
(202) 839-4486
dwachtel@tristerross.com

Attorney for Plaintiff
Dina Dukhqan

23

# ATTACHMENT A

EEOC Form 161-B (01/2022)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | Dina Dukhqan<br>5125 25th Pl N<br>ARLINGTON, VA 22207 | From: | Washington Field Office<br>131 M Street, NE Fourth Floor, Suite 4NWO2F<br>Washington, DC 20507 |
|---|---|---|---|

| EEOC Charge No.<br>570-2021-01255 | EEOC Representative<br>Yumi Cosbert,<br>Investigator | Telephone No.<br>202-921-2818 |
|---|---|---|

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

    More than 180 days have passed since the filing of this charge.

    The EEOC is terminating its processing of this charge.

*Equal Pay Act (EPA): You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.***

If you file suit, based on this charge, please send a copy of your court complaint to this office.

    On behalf of the Commission

| | Digitally Signed By:Mindy Weinstein<br>04/13/2022 |
|---|---|
| Enclosures(s) | **Mindy Weinstein**<br>**Director** |

cc:  **George Doumar**<br>
     **MAHDAVI DOUMAR BUDD & LEVINE PLLC**<br>
     gdoumar@mdbllaw.com<br>
     **Kelly T Kindig**<br>
     **Cozen O'Connor**<br>
     kkindig@cozen.com

     **David Wachtel**<br>
     **TRISTER, ROSS, SCHADLER & GOLD, PLLC**<br>
     dwachtel@tristerross.com

Enclosure with EEOC
Form 161-B (11/09)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you** *receive* **this Notice.** Therefore, you should **keep a record of this date.** Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed* **to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than** <u>2 years (3 years)</u> before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit <u>before 7/1/10</u> -- *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request** <u>within 6 months of this</u> **Notice.** (Before filing suit, any request should be made within the next 90 days.)

***IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.***

EEOC Form 161-B (01/2022)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

| To: | Dina Dukhqan<br>5125 25th Pl N<br>ARLINGTON, VA 22207 | From: | Washington Field Office<br>131 M Street, NE Fourth Floor, Suite 4NWO2F<br>Washington, DC 20507 |
|---|---|---|---|

| EEOC Charge No.<br>570-2021-00040 | EEOC Representative<br>Yumi Cosbert,<br>Investigator | Telephone No.<br>202-921-2818 |
|---|---|---|

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

More than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

*Equal Pay Act (EPA): You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.*

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Digitally Signed By:Mindy Weinstein
04/13/2022

Enclosures(s)

**Mindy Weinstein
Director**

cc:  **George Doumar
MAHDAVI DOUMAR BUDD & LEVINE PLLC**
gdoumar@mdbllaw.com
**Kelly T Kindig
COZEN O'CONNOR**
Kkindig@cozen.com

**David Wachtel
Trister, Ross, Schadler & Gold, PLLC**
DWachtel@tristerross.com

Enclosure with EEOC
Form 161-B (11/09)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS   --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you** *receive* **this Notice**. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed* **to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS   --   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than** 2 years (3 years) before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION   --   Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request** within 6 months of this Notice. (Before filing suit, any request should be made within the next 90 days.)

***IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.***